Noreen CRUZ–LOVO, Plaintiff,

v.

RYDER SYSTEM, INC., and Ryder
System Federal Credit Union,
Defendants.

No. 02–20891–CIV–HUCK/TURNOFF.

United States District Court,
S.D. Florida.

Feb. 21, 2003.

Peter Marcellus Capua, Lorenzo & Capua, Paul Augustus Capua, Astigarraga, Davis, Mullins & Grossman, Miami, FL, for Plaintiff.

Carol Celeiro Lumpkin, Melissa Denise Williams, Akerman, Senterfitt & Eidson, Devand Anthony Sukhdeo, Littler Mendelson, Karen Ann Brimmer, Hinshaw & Culbertson, Miami, FL, Karen Ann Brimmer, Hinshaw & Culbertson, Fort Lauderdale, FL, for Defendants.

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

HUCK, District Judge.

THIS CAUSE comes before the Court on Defendant Ryder System, Inc.'s ("Ryder") Motion for Summary Judgment [DE # 44], and Defendant Ryder System Federal Credit Union's ("Credit Union") Notice of Joinder in Defendant Ryder's Motion for Summary Judgment [DE # 45], both filed November 29, 2002 (collectively, "Defendants' Motion for Summary Judgment"). Plaintiff, Noreen Cruz–Lovo ("Plaintiff"), brings this action under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2615 *et seq.* ("FMLA" or the "Act") alleging that Ryder and Credit Union, as her employers, breached their duties and obligations: (1) to provide Plaintiff with notice her rights under the FMLA; (2) to designate her request for leave as FMLA leave; and (3) to grant such leave. (Am. Compl. at ¶ 36.) Both Defendants seek summary judgment arguing, for different reasons, that they are not Plaintiff's "employer" with the meaning of the FMLA. The Court has carefully reviewed the motion, response, and reply, relevant case law, and the record. For the reasons set forth below, the Court will grant Defendants' Motion for Summary Judgment.

## I. BACKGROUND

Plaintiff is a resident of Miami, Florida, and was employed as an accounting clerk. Ryder is a Florida corporation headquartered in Miami, Florida. Credit Union is a federally chartered banking entity which provides banking and financial services to its members, which include the employees of Ryder and its subsidiaries and the employees of Credit Union. Plaintiff worked in Credit Union's accounting department from April 1997 until April 2001. During this time, she alleges that both Ryder and Credit Union acted as employers with respect to her and that, therefore, they were both her "employers" within the meaning of the FMLA.

### A. Ryder and Credit Union

Ryder is a large company with many subsidiaries and affiliates. Ryder has hundreds, if not thousands, of employees while Credit Union employs about twenty people. It is undisputed that Ryder and Credit Union are separate legal entities with separate boards of directors and officers. Notwithstanding this fact, Credit Union pays Ryder to perform certain services for Credit Union, such as payroll processing.[1] Credit Union purchases

---

1. Regarding payroll processing: it is undisputed that, for a time, Ryder was processing the payroll and tax forms of Credit Union employees using Ryder's tax identification number. Ryder presents evidence, both via testimony and declaration, that this was an error. Plaintiff asserts that it was not an error; however, she provides no evidence to support this assertion. Error or not, for reasons discussed later in this Order, the Court finds that

these services from Ryder for administrative convenience and could, at its discretion, hire another company to perform these services. In addition to providing payroll services, Ryder provides certain employee benefits to those Credit Union employees who elect to take advantage of such benefits. Credit Union also rents space for Ryder for its offices and utilizes Ryder's Human Resources Department on an ad hoc basis, which includes use of certain Ryder forms (such as Ryder's employment application forms) and practices. As a result of this relationship, Credit Union benefits from Ryder's expertise in these areas as well as the economies of scale resulting from Ryder's larger operations.

### B. Plaintiff's Employment at Credit Union

In April 1997, Plaintiff began working in Credit Union's accounting department as a temporary, full-time employee for ninety days. At the end of the ninety-day temporary period, Plaintiff applied for a full-time permanent position in Credit Union's accounting department. The employment application was prepared by Ryder for use by Ryder, its subsidiaries and affiliates. On the application, Plaintiff indicated that she was applying for the position of "Accounting Assistant [at] RCU." The fourth page of the application contained an "at-will clause," which provides as follows:

> If an employee relationship is established, I understand that such employment is terminable at will, by either myself or *Ryder System, Inc. and/or its subsidiaries or affiliates* (the Company), at any time, for any reason, with or

the appearance of Ryder's tax identification number on these forms is not determinative of any employment relationship between Ryder and employees of Credit Union.

without cause, and with or without notice. I also understand that any period of employment is not for a specific duration. In addition, I understand that no one is authorized to make oral exceptions to this policy, and written exceptions are permitted only when they are signed by the Chief Executive Officer of Ryder System, Inc.

(emphasis added). Plaintiff's employment application was processed by Ryder's human resources department and approved by Credit Union's President and Vice President, Elba Suarez. Ms. Suarez also signed Plaintiff's offer letter. Ryder's human resource department conducted Plaintiff's background check and employee orientation.

Plaintiff worked in Credit Union's accounting department as a full-time, permanent employee from August 1997 until she was terminated on April 9, 2001. During this time Plaintiff answered directly to Elba Suarez. In addition to being Plaintiff's direct supervisor, Ms. Suarez hired Plaintiff, conducted her annual performance appraisals, approved her requests for leave, and made the ultimate decision to fire her.[2]

### II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue is "material"

2. It is undisputed that Ms. Suarez consulted with a representative of Ryder's human resource department prior to firing Plaintiff. The purpose of this meeting was to insure that Ms. Suarez, who was not trained in human resources, followed proper procedures.

if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Allen v. Tyson Foods,* 121 F.3d 642, 646 (11th Cir. 1997). An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Allen,* 121 F.3d at 646. On a motion for summary judgment, the Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party, and determine whether that evidence could reasonably sustain a jury verdict. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Allen,* at 646. While the burden on the movant is great, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment. *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505. A mere "scintilla" of evidence in favor of the non-moving party, or evidence that is merely colorable or not significantly probative is not enough. *Id.; see also Mayfield v. Patterson Pump Co.,* 101 F.3d 1371, 1376 (11th Cir.1996) (conclusory allegations and conjecture cannot be the basis for denying summary judgment).

### III. *DISCUSSION*

Ryder and Credit Union argue that they are entitled to summary judgment because they are not Plaintiff's "employer" within the meaning of the FMLA. Specifically, Defendant Ryder contends that it is not—and had never been—Plaintiff's employer. Credit Union, on the other hand, admits to having been Plaintiff's employer; however, Credit Union maintains that it employs

fewer than fifty employees and, therefore, does not meet the definition of "employer" under the FMLA.[3] In response, Plaintiff maintains that Ryder and Credit Union constitute a "joint" or "integrated" employer of Plaintiff. Under a joint employer or integrated employer theory, Ryder and Credit Union, though separate entities, could be deemed to be parts of a single employer for purposes of the FMLA. *See* 29 C.F.R. § 825.104(c)(1). According to Plaintiff, if Ryder and Credit Union are deemed to be a single employer under one of these theories, both entities could be liable to Plaintiff as her employers under the FMLA. Plaintiff concedes, however, that should the Court find that Ryder is not Plaintiff's employer, both Ryder and Credit Union would be entitled to summary judgment.

### A. Determining the Existent of an Employer/Employee Relationship Under the FMLA

The determination of whether an employer/employee relationship exists, within the meaning of federal labor statutes, such as the FMLA, is a question of federal law. *See Aimable v. Long & Scott Farms,* 20 F.3d 434, 440 (11th Cir.), *cert denied,* 513 U.S. 943, 115 S.Ct. 351, 130 L.Ed.2d 306 (1994) (interpreting the definition of "employer" under the Migrant and Seasonal Agricultural Worker Protection Act ("MSAWPA"), 29 U.S.C. § 1801 *et seq.,* and the Fair Labor Standards Act ("FLSA") 29 U.S.C. § 201 *et seq.,* which both use the same definition of to "employ" as the FMLA); *see also Antenor v. D & S Farms,* 88 F.3d 925, 929 (11th Cir.1996); *Jeanneret v. Aron's East Coast*

---

**3.** The FMLA states that the term "employer" means "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar work weeks in the current or preceding year". *See* 29 U.S.C. § 2611(4)(A)(i). The parties agree that Credit Union, standing alone, does not meet this definition.

*Towing,* No. 01–8001–CIV–HURLEY, 2002 WL 32114470, at \*2, 2002 U.S. Dist. LEXIS 12200, at \*5 (S.D.Fla. Jan. 29, 2002), *per curium aff'd,* 54 Fed.Appx. 685 (11th Cir.2002).

As a threshold matter, for Plaintiff to prevail on her claims against Defendants, she must establish that Defendants "employed" her within the meaning of the Act. *See* 29 U.S.C. § 2611(3) (adopting the FLSA's definition of "employ" contained in 29 U.S.C. § 203(g)). In defining "employment" under the FLSA, and by extension the FMLA, Congress expressly rejected the common-law definition of employment, which is based on limiting concepts of control and supervision. *See Walling v. Portland Terminal Co.,* 330 U.S. 148, 150–51, 67 S.Ct. 639, 91 L.Ed. 809 (1947); *Aimable,* 20 F.3d at 439. Rather, an entity "employs" a person under the FMLA if it "suffers or permits" the individual to work. *See* 29 U.S.C. §§ 203(g), 2611(3); *see also* 29 C.F.R. § 825.105(a). An entity "suffers or permits" an individual to work if as a matter of *economic reality,* the individual is dependent on the entity. *Goldberg v. Whitaker House Cooperative, Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961); *Aimable,* 20 F.3d at 439.

To assure the protection of employees, the FMLA's statutory scheme makes it clear that a worker can be economically dependent on, and thus employed by, more than one entity at the same time. *See* 29 C.F.R. §§ 825.104, 825.106. The regulations interpreting the FMLA provides to two theories under which multiple entities can be deemed the "employer" of an employee: the "integrated employer" theory and the "joint employment" theory.[4]

### B. The Integrated Employer Theory

■ The Federal Regulations interpreting the FMLA provide the following factors for the court to consider in determining whether two or more entities constitute an integrated employer:

(i) Common management;

(ii) Interrelation between operations;

(iii) Centralized control of labor relations; and

(iv) Degree of common ownership/financial control.

29 C.F.R. § 825.104(c)(2). In considering these factors, the regulations caution that the "determination of whether or not separate entities are an integrated employer is not determined by the application of any single criterion, but rather the entire relationship is to be viewed in its totality." *See id.*[5]

---

**4.** Under these theories, separate entities could be deemed to be parts of a single employer for purposes of the FMLA. *See* 29 C.F.R. § 825.104(c). These regulations make it clear that, under normal circumstances, the legal entity which directly employs the employee is the employee's employer for purposes of the FMLA. *Id.* However, in situations such as the instant case, the regulations provide that the two entities will be viewed as a single employer of an employee provided they meet either the " 'joint employment' test discussed in § 825.106, or the 'integrated employer' test discussed in paragraph (c)(2) of this section." *Id.*

**5.** Under the "integrated employer" test, several companies may be considered so interrelat-

ed that they constitute a single employer. *See Armbruster v. Quinn,* 711 F.2d 1332, 1337–38 (6th Cir.1983); *York v. Tennessee Crushed Stone Ass'n,* 684 F.2d 360, 362 (6th Cir.1982). The "integrated employer" test initially was developed in the labor relations context, *see Radio & Television Broadcast Technicians Local 1264 v. Broadcast Serv. of Mobile, Inc.,* 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965) (per curiam), and subsequently was imported into the civil rights context, *see Armbruster,* 711 F.2d at 1336–37 (discussing the integrated employer test in the context of Title VII). Pursuant to its authority to promulgate regulations "necessary to carry out" the FMLA, *see* 29 U.S.C. § 2654, the Department

In *Hukill v. Auto Care, Inc.*, 192 F.3d 437 (4th Cir.1999), the Fourth Circuit thoroughly analyzed the integrated employer test set forth in 29 C.F.R. § 825.104(c)(2). The Court finds this authority to be both well-reasoned and persuasive. Further, as the Court is unable to find any Eleventh Circuit case law applying the integrated employer test in the context of the FMLA, the Court will consider the court's analysis in *Hukill* in determining whether Ryder and Credit Union constitute an integrated employer of Plaintiff within the meaning of this regulation.

### 1. Common management

With respect to common management, the *Hukill* court looked to: "who had control[ ] of the day-to-day operations of the business" and "who had the authority to hire and fire employees." *Hukill*, 192 F.3d at 443. In the instant case, it is undisputed that both Ryder and Credit Union have there own managers, officers and directors, and that Elba Suarez, an officer of Credit Union and Plaintiff's direct supervisor, made the day-to-day management decisions pertaining to Plaintiff and the other employees in Credit Union's accounting department. It is also not disputed that she had, and exercised, the authority to hire and fire Plaintiff, and that she controlled all other relevant terms of her employment, including conducting performance appraisals of Plaintiff and ap-

proving her requests for leave. There is no evidence presented in this case that would allow a reasonable trier of fact to conclude that Ryder exercised any managerial control over Plaintiff.[6] As such, this factor favors a finding of no integrated employer relationship between Ryder and Credit Union.

### 2. Interrelation of operations

With respect to the interrelation of operations, the *Hukill* court indicated that the mere fact that one company "purchase[s] administrative services" from another company is not dispositive of this element. *Id.* In fact, the court found that "this practice is not unusual in today's business climate and is of no consequence." *Id.* The Court of Appeals further emphasized that this practice is expected based on the demands of certain industries or where a company is too small to economically and efficiently provide services such as employee benefits, payroll processing, or even human resource support:

> Firms too tiny to achieve the realizable economies of scale or scope in their industry will go under unless they can integrate some of their operations with those of other companies, whether by contract or by ownership. The choice between the two modes of integration is unrelated to the exception. Take contractual integration first. A firm too small to have its own pension plan will

of Labor has adopted the "integrated employer" test discussed above.

6. Plaintiff attempts to establish that Ryder had control over the hiring and firing of Credit Union employees based on the generic "employment at-will" clause found in Plaintiff's employment application form. This form was prepared by Ryder's human resources department for use by Ryder as well as Ryder's subsidiaries and affiliates, including Credit Union. Accordingly, this application, at times, uses vague terminology, such

as "Ryder and/or its subsidiary or affiliates," to allow some the application the necessary flexibility to be used by multiple entities. However, on balance, Plaintiff's application indicates that she is applying for a job with Credit Union, and the application is approved by Credit Union's President and Vice President. In addition, Plaintiff's offer of employment letter clearly indicates that Plaintiff's employment offer was from Credit Union. The letter was signed by Credit Union Vice President, Elba Suarez.

join in a multiemployer pension plan or will in effect pool with other employers by buying an insurance policy.... It will consult an outside law firm, representing many business firms, rather than having a staff of inhouse lawyers. It will hire an accounting firm to do its payroll rather than having its own payroll department. It may ask the Small Business Administration for advice on how to maximize its profits by pruning its least profitable operations. None of these forms of contractual integration would subject tiny employers to the antidiscrimination laws, because the integration is not of affiliated firms. Why should it make a difference if the integration takes the form of common ownership, so that the tiny employer gets his pension plan, his legal and financial advice, and his payroll function from his parent corporation without contractual formalities, rather than from independent contractors?

*Id.* at 443–444 (quoting *Papa v. Katy Indus., Inc.*, 166 F.3d 937, 942 (7th Cir. 1999)).

In this case, Credit Union is purchasing services from Ryder, such as payroll processing, commercial space for its offices, and employee benefits. It is undisputed that Credit Union could, at its discretion, obtain these services from another outside vendor. This Court agrees with the reasoning of the Fourth and Seventh Circuit with respect to this issue and, therefore, rejects Plaintiff's contention that Credit Union's leasing of the above-mentioned services from Ryder, in and of itself, is probative of an integrated employer relationship.

The evidence presented by Defendants in this case shows unequivocally that Credit Union is in the business of providing banking and financial services. As such, Credit Union focuses it business opera-

tions toward providing banking services. Ryder, on the other hand, is not in the banking business. There is nothing in the record to indicate an interrelation of operation between Ryder and Credit Union. Accordingly, this factor does not favor a finding of an integrated employer relationship.

### 3. Centralized control of labor relations

With respect to labor relations, there is no evidence that the control of labor relations was centralized. While it is true that Credit Union utilizes Ryder's human resource department on an ad hoc basis, Plaintiff has made no showing that Ryder gained control of Credit Union's labor relations as a result. To the contrary, Credit Union has sole authority to hire, fire, and supervise its employees. *Cf. id.* at 444; *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1363 (10th Cir.1993) ("To satisfy the control prong, a parent must control the day-to-day employment decision of subsidiary.") This factor also favors Defendants.

### 4. Degree of common ownership/financial control

With respect to common ownership, although, arguably, Plaintiff has made some showing of common ownership—in that Credit Union is owned by its members, which include employees of Ryder and its subsidiaries—such a showing is not enough, when viewed in light of the other elements, to establish that Ryder and Credit Union constitute integrated employers. *Cf. id.* (citing *Johnson v. Flowers Indus., Inc.*, 814 F.2d 978, 982 (4th Cir. 1987) ("One-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying an alter ego theory to pierce the corporate veil")) (citations and internal quotations omitted).

As the *Hukill* court stated, "the 'integrated employer' test instructs a court to determine '[w]hat entity made the final decision regarding employment matters related to the person claiming discrimination.'" *Id.* (quoting *Trevino v. Celanese Corp.*, 701 F.2d 397, 404 (5th Cir.1983)). In this case, it is undisputed that Credit Union, through Ms. Suarez, made the final decision with respect to Plaintiff's requests for leave and the ultimate decision to terminate Plaintiff. As such, Plaintiff has failed to demonstrate an integrated employer relationship in this case.

## C. The Joint Employment Theory

■ The issue of joint employment liability is addressed in 29 C.F.R. § 825.106, which provides, in part, that single employer status may attach to separate employers where an employer exercises some kind of substantial control over the work of the other employer's employee. Section 825.106(a) sets forth the three situations where separate employers may constitute a joint employer of an employee. This regulation provides as follows:

Where the employee performs work which simultaneously benefits two or more employers . . . a joint employment relationship generally will be considered to exist in situations such as:

(1) Where there is an arrangement between employers to share an employee's services or to interchange employees;

(2) Where one employer acts directly or indirectly in the interest of the other employer in relation to the employee; or,

(3) Where the employers are not completely disassociated with respect to the employee's employment and may be deemed to share control of the employee, directly or indirectly, because one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 825.106(a). This regulation does not provide much guidance to assist courts in defining the exact boundaries of a joint employment relationship. Accordingly, courts look to FLSA case law and regulations to help determine whether an entity is a joint employer for purposes of the FMLA. *See, e.g., Moreau v. Air France*, No. C–99–4645, 2002 WL 500779 (N.D.Cal. Mar.25, 2002). In this regard, Eleventh Circuit has identified criteria from Supreme Court and circuit court case law interpreting the definition of "joint employer" under various federal labor statutes. *See Antenor*, 88 F.3d at 932; *Aimable*, 20 F.3d at 440–445; *Jeanneret*, 2002 WL 32114470, at *2, 2002 U.S. Dist. LEXIS 12200, at *5. According to *Jeanneret*:

In determining whether a joint employment relationship exists, the courts consider several relevant factors: (1) the nature and degree of the putative employer's control of the workers; (2) the degree of supervision, direct or indirect, of the work; (3) the right, directly or indirectly, to hire, fire, or modify the workers' employment conditions; (4) the power to determine the workers' pay rates or methods of payment; (5) the preparation of payroll and payment of workers' wages; (6) the ownership of the facilities where the work occurred; (7) whether the worker performed a line job integral to the end product; and (8) the relative investment in equipment and facilities.

*Id.* at *2, 2002 U.S. Dist. LEXIS 12200, at *7–*8 (citing *Antenor*, 88 F.3d at 932; *Aimable*, 20 F.3d at 440–45; *Santelices v. Cable Wiring*, 147 F.Supp.2d 1313, 1326

(S.D.Fla.2001).)[7] The court in *Jeanneret* also indicated that this analysis should be guided by the following principles enumerated by the Eleventh Circuit in *Antenor:*

First, the question of "joint employment" is not dependent on whether the worker is more economically dependent on one putative employer than on the other, because more than one entity can be an employer. Second, the existence of a joint employment relationship depends on the economic reality of all the circumstances, rather than any one factor. Third, the factors are used because they are indicators of economic dependence. Fourth, the joint employment relationship is not determined by a mathematical formula—the court must view each of the factors qualitatively to assess the evidence of economic dependence. Fifth, the inquiry must focus on the issue of economic dependency, not common-law concepts of employment. Sixth, the [FMLA] is a remedial statute, and courts must construe it broadly.

*Id.* at *3, 2002 U.S. Dist. LEXIS 12200, at *8 (citing *Antenor,* 88 F.3d at 932–33). Like *Jeanneret* and *Antenor,* the Court is guided by these principles in analyzing this case. As much of the analysis under this test overlaps the analysis under the integrated employer test, the Court will only briefly discuss each of the factors as they relate to this case.

### 1. *The Nature and Degree of Control of Workers*

█ The first factor concerns the nature and degree of the alleged employer's control over the employee. In *Antenor* and *Aimable,* the Eleventh Circuit applied this indicator to seasonal agricultural workers who sued the landowners and labor con-tractors to enforce wage requirements under the FMLA and the MSAWPA. The *Antenor* court stated that indicia of control include who determines the number of workers hired for a job, when work should begin on a particular day, which workers should be disciplined or retained. *See Antenor,* 88 F.3d at 933. As stated above, there is no evidence in the record to indicate that Ryder maintained direct control over Plaintiff's work. To the contrary, the evidence in the record shows that Credit Union, through Elba Suarez, maintained exclusive managerial control over Plaintiff.

The only evidence advanced by Plaintiff in support of her contention that Ryder maintained control over Credit Union employees was the "at-will" clause contained in the employment application used by both Ryder and Credit Union. Plaintiff argues that, because the clause states that any employment relationship that is established is terminable at will "by either [the employee] or Ryder System, Inc. and/or its subsidiaries or affiliates," Ryder necessarily exercises control of Credit Union employees. However, courts instruct that, "in determining whether an employment relationship exists, the court must examine the actual relationship between the parties to find whether the worker was economically dependent on the alleged employer." *Jeanneret,* 2002 WL 32114470, at *4, 2002 U.S. Dist. LEXIS 12200, at *12. The ambiguous statement in the employment application does not cast any light on Plaintiff's actual working relationship. As such, it is not probative of any employment relationship between Ryder and Plaintiff.

### 2. *Degree of Supervision of Work*

As for the second factor, the degree of oversight or supervision of work, the Elev-

---

7. The *Aimable* court developed this multi-factor test by combining criteria enumerated in Department of Labor regulations with other criteria gleaned from legal decisions to which the regulations refer. *See Aimable,* 20 F.3d at 439.

enth Circuit stated that "supervision is present whether orders are communicated directly to the laborer or indirectly through the contractor." *Aimable*, 20 F.3d at 441. This factor is similar to the previous one. *Jeanneret*, 2002 WL 32114470, at *5, 2002 U.S. Dist. LEXIS 12200, at *15. In this case, Ryder has established that it never supervised the work performance of Plaintiff or any other Credit Union employee. In fact, it is undisputed that Ms. Suarez, alone, supervised Plaintiff's work.

In support of her argument that this factor favors finding that an employment relationship exists between herself and Ryder, Plaintiff points to the fact that Ryder provides human resource services to Credit Union. While it is true that Credit Union managers utilize Ryder's human resource department on an ad hoc basis, Plaintiff has presented no evidence that any Ryder human resources representative exercised control over Plaintiff or any other Credit Union employee. In fact, Plaintiff has presented nothing to refute the evidence presented by Defendants that Ms. Suarez supervised all of Plaintiff's work and that Credit Union had sole managerial control over Plaintiff while it employed her.

### 3. Right to Hire, Fire, or Modify the Workers' Employment Conditions

The third factor relates to whether the alleged employer possessed the right to hire, fire, or modify the worker's employment conditions. Ryder presented unrebutted evidence that did not have any power to hire, fire, or modify Plaintiff's conditions of employment. As stated above, Credit Union through Ms. Suarez possessed, as well as excised, her right to hire, fire, and modify Plaintiff's conditions of employment. The record indicates that Credit Union recruited, interviewed, hired, and disciplined its own employees. Credit Union also set its employees working hours and schedules, and made all decisions regard leave.

### 4. Power to Determine Pay Rates or Methods of Pay

The next factor relates to the degree to which the alleged employer has the power to determine the pay rates or methods of pay of its employees. The record indicates that Ryder did not—and had no right to—determine the rates and methods of pay of Credit Union's employees. Rather, Credit Union alone determined the rates and methods of pay of its employees. In *Antenor*, the court stated that pay rate refers not only to the amount of compensation to be paid, but includes benefits, such as worker's compensation insurance and social security, and how these various payments are allocated. *Antenor*, 88 F.3d at 936. In this case, the evidence establishes that Elba Suarez set Plaintiff's initial pay rate and all of her raises. There is no evidence that such rates were set by Ryder. It is true, as discussed above, that Ryder provides certain employee benefits to Credit Union employees as part of an agreement between Ryder and Credit Union. However, the mere fact that Credit Union elects to have Ryder provide such services, is not probative evidence that Ryder has the power to determine the rates and methods of pay. As stated earlier, Credit Union elects to have Ryder provide these services and can, at it discretion, cancel this arrangement.

### 5. Preparation of Payroll and Payment of Wages

The fifth factor looks to whether the alleged employer was involved in the preparation of payroll and the payment of wages to the employee. According to the *Antenor* court, this factor is probative of

joint employment because of the likelihood that when a business undertakes to help another to prepare its payroll and pay its wages, it is likely that the [other business] lacks economic substances on which the employees can solely depend. *See id.*

The parties acknowledge that Ryder prepares payroll checks, sets aside taxes and insurance premium payments for Credit Union's employees pursuant to a contract between Ryder and Credit Union.[8] However, the evidence indicates that Ryder's function is administrative and that the money for the payment of wages and benefits to Credit Union's employees actually comes from Credit Union, and not Ryder.

Under this factor, while the fact that Ryder prepared the payroll checks and paid taxes and other expenses is probative evidence of joint employment, it is by no means dispositive. The fact that actual wages paid to Plaintiff came from Credit Union weights against a finding that Credit Union lacks "economic substance." *Cf. Jeanneret*, 2002 WL 32114470, at *8, 2002 U.S. Dist. LEXIS 12200, at *22 (finding that the mere fact that the alleged employer prepared employees' tax forms in its own name, prepared payroll checks, and set aside for employees' taxes and benefits, was not dispositive of the issue of whether the alleged employer was actually the employees' employer). Therefore, while there is a little evidence under this factor tending to support joint employment, on whole, this factor favors Defendants' position.

### 6. *Ownership of Facilities Where Work Occurred*

The sixth factor indicative of an employer relationship, the ownership of the facilities where the relevant work occurred, is probative of joint-employment status for the obvious reason that without the land, the employees might not have work, and because a business that owns or controls the worksite may be able to prevent labor law violations. *See Antenor*, 88 F.3d at 937. In this case, Ryder concedes that it owns the facilities which house Credit Union's offices. Viewing this fact in a vacuum, this factor appears to favor Plaintiff. However, it is necessary to view this fact in light of all of the evidence in this case. First, it is important to look at the nature of Credit Union's business. As stated earlier, Credit Union provides banking services to Ryder's employees. Common sense dictates that Credit Union location would be within Ryder's facilities in order to serve its members. Further, it is undisputed that Ryder *rents* this office space from Ryder. This fact negates the implication that Credit Union is economically dependent on Ryder. On whole, this factor favors neither Defendants' nor Plaintiff's position.

### 7. *Performance of a Line Job Integral to Defendant's Business*

The seventh factor considered by the Court in *Antenor*, whether the employee performed a line job integral to the alleged employer's business, is probative of joint employment because a worker who performs a routine task that is a normal and

---

8. Further, the record indicates that, for a time, Ryder listed its own tax identification number on the tax forms of Credit Union employees. The Court finds that this does not demonstrate an employment relationship between Ryder and employees of Credit Union as it does not address any working relationship between Credit Union's employees and Ryder. *Cf. Jeannerette*, 2002 WL 32114470, 2002 U.S. Dist. LEXIS 12200 (finding that the mere fact that the defendant's name was listed as "employer" of the plaintiffs' employment agreement, paychecks, and tax forms was not probative of any employment relationship between the plaintiffs and defendant).

integral phase of the alleged employer's business is likely to be dependent on that employer's overall enterprise. In this case, Plaintiff was employed in the Credit Union's accounting department. Her job was integral to Credit Union's business, providing banking services. It was not integral to Ryder's business. Accordingly, this factor weighs against joint employment.

### 8. *Investment in Equipment and Facilities*

The final factor to be considered is the relative degree of investment in equipment and facilities by Ryder and Credit Union. This factor is probative because it is more likely that the worker is economically depended on the entity that supplies the equipment or facilities. In this case, it appears that both Ryder and Credit Union have made an investment in facilities. With respect to Ryder, it is undisputed that Ryder owns the building that houses Credit Union's offices. With respect to Credit Union, it is likewise undisputed that Credit Union pays rent to Ryder for its office space. With respect to investment in equipment, there is no evidence in this case with regard to the ownership of equipment. This factor favors neither Defendants nor Plaintiff.

### CONCLUSION

Based on the foregoing, the Court finds that Ryder was not an employer of Plaintiff under either the "integrated employer" theory or the "joint employment" theory discussed above. As such, the Court concludes that Ryder was not Plaintiff's employer within the meaning of the FLMA and, therefore, that Ryder is entitled to summary judgment. Further, because the parties have stipulated that Credit Union, alone, does not have the requisite number of employees to fall within the FMLA's

definition of employer, the Court concludes that Credit Union is also entitled to summary judgment. Accordingly, it is

ORDERED AND ADJUDGED that Defendants' Motion for Summary Judgment [DE # 44] is GRANTED as to both Defendants. Final Judgment will be issued in a separate order.